STATE OF IOWA, Appellee, v. CHARLES CESSNA, Appellant.

**HOMICIDE:** Included Offense—Conviction of Offense Less Than
1 Justified. If evidence would justify a verdict of guilt of assault with intent to kill, defendant cannot complain that the jury returned a verdict of assault with intent to do great bodily harm.

**CRIMINAL LAW:** Invasion of Home—Intruders—Defense of Habi-
2 tation—Degree of Force Permitted. One engaged in the commission of no offense may use force to protect his home from invasion by those who have entered without invitation and without indication as to their mission, and who are in good faith believed to be mere intruders. The degree of force permitted is that force which a reasonably cautious and prudent man would employ under like circumstances. As long as the force employed does not exceed this standard, he is guilty of no offense.

**TRIAL:** Instruction—Incorrect Instruction Suggesting Correct One
3 on Vital Issue—Effect. An incorrect requested instruction on a vital issue has the effect of calling the attention of the court to the point, thereby placing the court on its guard and necessitating a correct instruction on the point.

*Appeal from Hamilton District Court.*—HON. R. M. WRIGHT, Judge.

WEDNESDAY, JUNE 23, 1915.

THE defendant was accused of assault with intent to murder, and was convicted of an assault with intent to do great bodily injury. He appeals.—*Reversed.*

*D. C. Chase,* and *R. G. Remley,* for appellant.

*George Cosson,* Attorney General, *W. S. Rankin,* Special Counsel, and *O. J. Henderson,* County Attorney, for appellee.

LADD, J.—The defendant, with his family, resided in the second story of a flat, and at about 9 o'clock in the evening of October 29, 1913, Rufus E. Nelson, sheriff of Hamilton county, with his deputy, C. D. Carl, night policeman, Bert Williams, and Herman Rutledge, entered from the hallway a room about 18 feet long and 12 feet wide. Immediately thereafter, defendant came in through a door at the opposite corner and, according to the testimony of Nelson, said, "It's me you are looking for, is it?" and pointed an army gun at Carl, who cried, "Cessna, don't shoot." Nelson moved a little toward him, when he turned the gun on Nelson, and, as some of the witnesses say, the hammer clicked as though he had pulled the trigger. He was then overpowered; but, as is said by witnesses for the state, told his son to get the gun and "shoot these fellows," and also asked for a knife, declaring, "I will cut the guts out of the g— d— s— of a b— of a Norwegian." No information had been filed against the defendant, and he was not informed by the sheriff or any other of those present that they were officers. The evidence on behalf of the state tended to show that the defendant was not intoxicated, and Robertson, who was visiting at the place with defendant's father-in-law, testified that before the officers came, defendant had said that "if that marshal comes up here tonight I am going to kill him. I am going to spill his blood on this floor."

It seems that Mrs. Cessna had become frightened because of defendant's having been drinking during the day, and had called the night policeman. On the other hand, defendant testified that on the way home from doing carpenter work the day previous, he had noticed some geese flying and concluded to take his rifle with him to see if he could get some of them; that he cleaned up the gun, loaded it with five shells, put two quarts of whisky in his suitcase with some tools; but, as "it was kind of stormy," concluded not to go out, and, as he testified, "about 10 o'clock that morning when I found that I wasn't going back to work, I opened one of the quart bottles from my suitcase and began drinking. About 2 o'clock, I

lost that one, misplaced it, and so I opened the other one."
He testified farther that he did not know how long he continued drinking, whether he ate dinner or supper or not, and that he had no recollection whatever of the sheriff and those with him having come to his house or entered the room or of anything whatever that occurred there, and he denied having made the threat testified to by Robinson.

I. Several questions are raised in the record, and the first of these is that the evidence did not justify a conviction of the particular offense of assault with intent to inflict great

1. HOMICIDE: included offense: conviction of offense less than justified.

bodily injury, it being contended that, as the gun was pointed at the head of defendant, he must have intended to kill, if he entertained any intent, and therefore could not have been guilty as found in the verdict. But the sheriff testified that "he pulled the gun on to Carl and on to me, and in the same position he had it on Carl," and that "he pulled the gun on to Carl." Carl testified that the gun was pointed at Nelson's head or upper part of his body when he snapped the trigger, so that the jury was not required to find that it was aimed at the sheriff's head, as assumed by appellant. There was room, then, to find his purpose as the jury found, and the defendant cannot complain if the jury was lenient in convicting him of a lower offense than it might under the evidence.

II. Appellant complains of the refusal to give the following instruction:

"You are further instructed that if you find that the sheriff and officers summoned a posse of citizens, and with them, they went to the home of defendant, and while there,

2. CRIMINAL LAW: invasion of home: intruders: defense of habitation: degree of force permitted.

without any warrant for his arrest, and while defendant was in no manner violating the law, and if, without first making themselves known to defendant and informing him the object of their visit, they endeavored to overpower and take him, then the resistance of the defendant was not unlaw-

ful, and if, in making such defence, defendant pointed a gun at the officers, he is not guilty of assault with intent to murder, or assault with intent to commit manslaughter, or assault with intent to do great bodily injury, or of simple assault, and must therefore be acquitted by you."

Though this does not correctly state the law, it did direct the attention of the court to a very important issue, which was not alluded to in the instructions. The defendant was in his own dwelling and not engaged in the commission of any offense. The sheriff with his posse entered in the night-time without any intimation as to their purpose, and, as might have been found, unknown by defendant to have been officers of the law. Had the sheriff intended to arrest him, he should, if afforded an opportunity so to do, have so informed him, and also of the cause of the arrest, of his authority to do so, that he was a peace officer and that defendant must submit. Sec. 5199, Code. Being unaware that he was about to be arrested, the defendant might have assumed that the sheriff and his posse were intruders and have taken such reasonable precautions to protect his home as an ordinarily cautious man would under like circumstances. The doctrine that every man's house, however humble, is his castle and he may protect it against invasions had its origin when the peace of the body politic as well as of individuals depended on the maintenance of the inviolability of houses as castles, and it still exists with equal reason for the maintenance of the inviolability of houses as homes. 1 Wharton's Crim. Law, Sec. 634. A person when assaulted in his habitation is not required to retreat, but may meet force with force. *State v. Middleham,* 62 Iowa 150; *State v. Bennett,* 128 Iowa 713. And he may defend his habitation, not as property, but because this may be necessary to the protection of himself and family. The principle is well expressed in *State v. Patterson,* 45 Vt. 308, 12 Am. R. 200:

3. TRIAL: instruction: incorrect instruction suggesting correct one on vital issue: effect.

"The idea that is embodied in the expression that a man's house is his castle is not that it is his property, and, as such, he has the right to defend and protect it by other and more extreme means than he might lawfully use to defend and protect his shop, his office, or his barn. The sense in which the house has a peculiar immunity is that it is sacred for the protection of his person and of his family. An assault on the house can be regarded as an assault on the person, only in case the purpose of such an assault be injury to the person of the occupant or members of his family, and, in order to accomplish this, the assailant attacks the castle in order to reach the inmates. In this view, it is said and settled that, in such case, the inmate need not flee from his house in order to escape from being injured by the assailant, but he may meet him at the threshold, and prevent him from breaking in by any means rendered necessary by the exigency; and upon the same ground and reason as one may defend himself from peril of life or great bodily harm, by means fatal to the assailant, if rendered necessary by the exigency of the assault."

Of course, one who is lawfully in a habitation must have warning to leave before force may lawfully be applied, but this having been done, force reasonably and apparently necessary to expel may be resorted to. But if the person or persons entering or who have entered are intruders and violent, and there without right, then such warning is not essential, and the same rule with respect to the application of force is applicable. The rules are accurately stated in 1 Bishop's New Crim. L., Sec. 859:

"If a man enters another's dwelling house peaceably, on an implied license, he cannot be ejected except on request to leave, followed by no more than the necessary and proper force, even though misbehaving himself therein. Yet if the entry itself is with violence, or is opposed, no request to depart need precede the act of turning out; since the tres-

passer knows, as well without express words as with, that his absence is desired."

The jury might have concluded that defendant was unaware that the persons entering were officers and supposed them mere intruders; and if so, should have been instructed that if they so found, defendant might, in repelling them from his dwelling, resort to such force as a reasonably cautious and prudent man would have done under like circumstances, and that if defendant so did, and did what such a man would have done, he should be acquitted; and on the other hand, if excessive force was used, or if such cautious and prudent person would not make use of the gun as defendant did, the defendant should have been convicted.

The record, in view of the request, was such as to exact the submission of this issue to the jury, and the omission so to do was error. In view of another trial, it is suggested that the jury be instructed concretely instead of abstractly as to the intent with which defendant may have acted.—*Reversed.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.